See also, Bkrtcy., 99 B.R. 938.

**In re Timothy D. RODEMEYER and Patricia Rodemeyer, Debtors.**

**Larry S. EIDE, Trustee, Plaintiff,**

**v.**

**Timothy D. RODEMEYER, Patricia Rodemeyer and Aid Association for Lutherans, Defendants.**

**Bankruptcy No. X88–00069M. Adv. No. X88–0116M.**

United States Bankruptcy Court, N.D. Iowa.

Jan. 4, 1989.

Randall Nielsen, Mason City, Iowa, for plaintiff.

G.A. Cady, III, Hampton, Iowa, for Rodemeyers.

Jeffrey Goodman, Ass't. U.S. Atty., Cedar Rapids, Iowa, for FmHA.

## MEMORANDUM OF DECISION AND ORDER RE: OBJECTIONS TO EXEMPTION IN LIFE INSURANCE AND COMPLAINT UNDER 11 U.S.C. §§ 544 AND 548

WILLIAM L. EDMONDS, Bankruptcy Judge.

There are two matters before the court. The case trustee, Larry S. Eide (TRUSTEE) and two creditors have filed objections to Timothy D. Rodemeyer's claim of exemption in a life insurance contract with Aid Association for Lutherans (AAL). The second matter is trustee's complaint under 11 U.S.C. §§ 544 and 548 seeking an avoidance of the transfer of property of the debtor in purchase of the life insurance contract and a return to the trustee of the transferred funds.

The objections to exemptions and the trustee's complaint were consolidated by previous order of this court.

Trial was held in Fort Dodge, Iowa on August 30, 1988. The parties have filed briefs in support of their positions. The court, having considered the evidence and the arguments of the parties, now issues the following ruling which includes findings of fact and conclusions of law pursuant to Bankr.R. 7052.

This is a core proceeding under 28 U.S.C. § 157(b)(2)(B), (H).

### FINDINGS OF FACT

1. Timothy D. and Patricia Rodemeyer, husband and wife, filed their joint voluntary petition under Chapter 7 of the Bankruptcy Code on January 15, 1988.

2. Timothy D. Rodemeyer (RODEMEYER) has been farming since 1973. He graduated from high school in 1971 and following graduation operated heavy equipment for two to three years prior to his beginning to farm. He has had no formal post-high school education.

3. During his farming career, Rodemeyer farmed as many as 800 acres in a season, some of which was owned by his father who is also a farmer.

4. In 1984 or 1985, Rodemeyer began obtaining operating loans from the United States of America acting for the Farmers Home Administration (FmHA).

5. Prior to 1984, he had obtained operating monies from the Hampton State Bank (BANK). His change from Bank to FmHA as a source of operating funds was occasioned by the Bank's concern over the perceived problem status of Rodemeyer's loan. Rodemeyer had granted Hampton State Bank a security interest in his crops and livestock.

6. Arrangements were made by Rodemeyer to have FmHA become the primary lender for his operation. As a result, on January 15, 1985, Mr. and Mrs. Rodemeyer entered into an agreement with the Bank in anticipation of the FmHA's new financing. Rodemeyers were to pay their Bank debt down to $99,500.00 which sum would then be represented by two promissory notes, one for $43,500.00 and the second for $56,-

000.00. The $43,500.00 note was to be paid in full on May 17, 1985 and is apparently no longer relevant to these disputes. The second note, in the amount of $56,000.00, was to draw interest at the rate of 13% with interest payable annually and principal reduction spread over four years. As part of the agreement executed January 15, 1985, Bank agreed it would subordinate its security interest in Rodemeyers' property to the security interest of the FmHA.

7. As a result of the agreement on February 1, 1985, Mr. and Mrs. Rodemeyer and Mr. Rodemeyer's parents executed a promissory note to Bank identified as note no. 012236. This note specified essentially the same terms of repayment, but provided a maturity date of December 31, 1989 stating that the note was a demand note but if no demand were made, then the note was due December 31, 1989. The promissory note also provided that it was "payable ¼ of prin. plus int. each 12/31 beginning 12/31/85 if funds are available from farm operatino (sic) by Tim & Pat." The promissory note also contained a security agreement granting Bank a security interest in inventory, equipment, farm products, accounts and other rights to payment and general intangibles. No legal description of any crop land was provided in the security agreement. Debtors also executed a financing statement in favor of Bank which was filed with the Iowa Secretary of State on February 1, 1985. Collateral described included equipment, livestock, crops, and general intangibles. "General intangibles" were described as including government payments. The financing statement did contain a legal description of crop land.

8. On July 2, 1986, Rodemeyers executed a security agreement in favor of FmHA which included a grant of security in crops, livestock and "[a]ll accounts, contract rights and general intangibles, as follows: CORN DEFICIENCY PAYMENTS".

9. Another security agreement was executed for FmHA on June 12, 1987. It granted FmHA a security interest in crops, livestock and accounts, contract rights and general intangibles, described as follows: "CASH PAYMENTS, PAYMENT IN KIND CERTIFICATES, ANY USDA PAYMENTS, OR CERTIFICATION OF PARTICIPATION IN ANY USDA PROGRAM."

10. On December 5, 1986, two documents were completed for FmHA. One was a "cash flow statement" showing the Rodemeyers' farm projections of income, expenses and debt repayment for the 1987 year. This cash flow statement was introduced into evidence as plaintiff's exhibit 9 and is sometimes called a "farm home statement." In the statement, debtors projected income from the sale of crops in the amount of $57,304.00; income from the sale of livestock in the amount of $210,204.00; and governments and patronage dividends in the amount of $31,358.00. Section "C.1.b." of the plan contemplated debt repayment to Federal Land Bank of Omaha (FLB) in the amount of $18,966.00 to be paid December 1, 1987 on a first mortgage loan from FLB. Source of the funds was to be the sale of corn, beans and hogs. Section "C.1.a." dealt with "improvements and key practices—farm, home and financial management." One item provided that debtors would "Get releases on all sales before spending the money." The farm home plan was executed by Mr. and Mrs. Rodemeyer and by Mark Dunn, Assistant County Supervisor for FmHA.

11. The second document executed on December 5, 1986 was an "agreement for the use of proceeds/release of chattel security." This was executed by Timothy D. Rodemeyer and Mark Dunn. In addition to the agreement between the FmHA and Mr. Rodemeyer, which was one page long, the form also included sheets containing columns for descriptions of dispositions of collateral both planned and actual. This form is described by FmHA as FmHA form 1961-1. The agreement between Timothy D. Rodemeyer and FmHA stated in pertinent part as follows:

"Tim and Pat Rodemeyer (referred to as the borrower) has (have) executed security instruments now held by the United States of America (referred to as the Government) at described property pledged by the borrower as collateral for

loan(s) received from the Farmers Home Administration (FmHA). The borrower plans to sell, exchange, or consume certain items of property and to use sales proceeds as described in this form. The Government will agree to allow the borrower to sell, exchange or consume security and to use the proceeds from the sale of such property provided the requirements of 7 CFR § 1962.17(b) are met and the following conditions are met:

(1) The proceeds from any sale, if any, are used for the purposes and in the amount set forth on the reverse side of this form.

(2) A current farm and home plan or other similar plan of operation acceptable to FmHA, if required by FmHA regulations, has been completed and signed by the borrower and FmHA. * * *

If the borrower wants to sell, exchange or consume property or to use proceeds in a way not shown on this form, the borrower must obtain the permission of the County Supervisor, in advance. Permission will be granted if the above conditions are met and if the requirements of 7 CFR § 1962.17(b) are met."

12. When Rodemeyers sold farm products, it was Mr. Rodemeyer's practice to go to the FmHA office with a list of proposed disbursements from the sale proceeds. From the information regarding sales, and his proposed uses, the columnar form of FmHA 1962–1 was filled out. Checks made out jointly to Rodemeyer or the Rodemeyers and FmHA were endorsed at this time. Four persons at FmHA had authority to countersign checks during the relevant time periods. These included Sherrie Johnson, a Ms. Forman, Wayne Ziegler and Mark Dunn.

13. Generally, the use of proceeds from actual sales of farm products or other collateral were recorded in the columns denoting actual disposition of collateral. The form contained an approval column which indicated assent or dissent to the proposed use.

14. Sometime prior to January 1, 1986, Timothy Rodemeyer, his wife, his father and Federal Land Bank of Omaha (FLB) entered into an "informal agreement" for Rodemeyers to assume Mr. Rodemeyer's father's mortgage loan with FLB. This informal assumption agreement was occasioned by Rodemeyers obtaining a deed from Mr. Rodemeyer's father for 200 acres of real property which was subject to the FLB loan. The informal assumption was discussed by Timothy Rodemeyer with FmHA before the arrangement was finalized.

15. On the assumed loan, Rodemeyers' payments to FLB were in the approximate amount of $18,000 per year. Payments on the loan to FLB were already delinquent at the time the loan was assumed. Rodemeyers began curing the arrearages by applying sale proceeds from the sale of machinery and equipment which took place in 1986. FmHA agreed to the sale.

16. Rodemeyers also began accumulating funds in 1986 in FLB's future payment account. Funds were withdrawn from this account by FLB to make a payment on the mortgage in 1986. In 1987, debtors made no deposits into the FLB future payment fund.

17. In 1986, Rodemeyers began feeding hogs. Aredale State Bank became involved in the financing of the hog operation. Debtor testified as to a subordination by FmHA to Aredale State Bank "in hogs" but no written subordination agreement where the details of any oral subordination were presented to the court.

18. Following the execution of the agreement between Hampton State Bank and Rodemeyers and the involvement of FmHA, Bank relied on FmHA to service the loan.

19. By early 1987, Rodemeyers were having cash flow problems and Rodemeyer felt, to a considerable extent, the likelihood of his farming operation surviving depended upon FLB's willingness to write down the assumed loan to an amount more in keeping with the value of the property securing the debt. One potential solution with FLB was to deed the mortgage property back to them and buy it back at a reduced price on contract. Since he had

begun negotiating with FLB for a write down and/or change in loan terms, he determined in 1987 not to place any money in the future payment fund in case he could not obtain agreement from FLB. Rodemeyer also felt that in order to survive financially, he would need to favorably resolve his debt to Hampton State Bank.

20. During 1987, Mr. Rodemeyer considered bankruptcy as one option.

21. Mr. Rodemeyer generally kept FmHA advised of his negotiations with FLB. The first apparent discussion between FmHA and Rodemeyer concerning possible bankruptcy was in June of 1987.

22. In the spring of 1987, Rodemeyer and Dunn of FmHA agreed that Rodemeyer could set aside the proceeds of sales of farm products secured to FmHA to make a payment to FLB when agreement was reached with that creditor on a write down of Rodemeyers' debt. By the time of the agreement, Rodemeyers were no longer using a supervised bank account with FmHA. Dunn suggested deposit to a savings account, which Rodemeyer later opened for that purpose. Dunn, of FmHA, also agreed that the specific purpose of the release of certain crop and livestock proceeds was for the payment of FLB. FmHA had a second mortgage on the property mortgaged to FLB. Dunn believed, that while there was no value to the second mortgage, if the FLB wrote down the indebtedness to market value and a payment was made to FLB, it would create equity in the land for FmHA, as mortgagee.

23. Although negotiations continued and certain terms were arrived at, no final agreement between Rodemeyers and FLB was ever worked out for a reduction of indebtedness.

24. When it became apparent that no agreement with FLB would be reached, FmHA, by Dunn, requested a return of the funds to FmHA. Dunn advised Timothy Rodemeyer that on January 4, 1988 that FmHA would not release those funds for a payment to FLB while Rodemeyers' operating loan to FmHA was delinquent. Rodemeyer responded to Dunn that the money had already been released.

25. Timothy Rodemeyer contacted his insurance agent, Dave Koenen, on January 5, 1988. Rodemeyer told Koenen that he had $25,000.00 to put in and they discussed the possibility of placing it in the already existing adjustable life policy. Rodemeyer had purchased the policy on his life in 1986. Mrs. Rodemeyer was primary beneficiary and their children were secondary beneficiaries. There was a 7½% front-end service charge. Rodemeyer told Koenen he desired to increase the policy cash value so that in the future, perhaps a year or two down the road, if an opportunity came up, he could buy land.

26. According to the testimony of Dave Koenen, AAL's adjustable life insurance policy is similar to universal life policies available in the insurance market.

The certificate of life insurance on Mr. Rodemeyer's policy was introduced into evidence as plaintiff's Exhibit 1 (Policy).

The policy provided a death benefit of $250,000.00. The planned periodic premium to be paid by Rodemeyer, for which he would apparently be billed, was $300.00 payable quarterly. Out of each such premium, there was deducted a 7½% premium expense charge.

Section 3.1 of the policy permitted debtor to pay premiums at any time and in any amount subject to certain restrictions. The minimal requirement, which presumably was met by the planned periodic premium, was that premium payments must be sufficient to maintain a cash value larger than the monthly deductions for costs of the policy.

Monthly deductions were covered under section 4.2 and its referenced sections. Deductions included charges for the cost of insurance, the cost of any benefit riders and any expense charges in effect. This would also include the 7½ percent premium charge. These costs were charged against the premiums paid.

Debtor, under the policy, could cease paying premiums and the policy would remain in effect so long as the cash value was sufficient to pay the monthly charges. Policy, section 3.2.

The cash value of the policy was created the instant of purchase and first included 92½% of the first premium less the monthly deduction, deducted on that date. Policy, section 4.1.

Cash value in the policy increases by the amount of premiums paid and interest earned. Policy, sections 4.1 and 4.6.

Cash value would decrease by the amount of the monthly charges and by any partial withdrawals. Policy, section 4.1.

The policy would be considered "paid-up" when the cash value was equal to or greater than the "paid-up cash value." "Paid-up cash value" was defined as "[t]he amount of cash value that is large enough to keep the specified amount ... in effect to the maturity date ... without payment of any more premiums." Policy, section 4.1.

Under section 5.1, withdrawal of the entire cash value of the policy would result in termination of the insurance policy. Under section 5.2, however, the debtor could withdraw part of the cash value but this withdrawal would apparently, under the contract, reduce the death benefit.

27. On January 6, 1988, Rodemeyers paid to Hobson, Cady & Drew, through the attorneys' trust account, the sum of $31,-121.52. This sum included the $20,525.80 set out in paragraph 32 of the Findings, *infra*. These funds were disbursed by the law firm prior to January 15, 1988. Debtors' attorneys received $1,000.00; debtors received $1,586.69. Various creditors of debtors received among them a total of $2,713.93. The largest disbursement was to Aid Association for Lutherans in the amount of $25,820.90 as an addition to Rodemeyer's policy. Prior to the payment, the policy had a cash value of $6,428.80.

28. The additional cash paid under the policy did not increase the already existing $250,000.00 death benefit. It did make it possible, however, for the policy's cash value, as it increased through accrual of interest, to make the policy self-sustaining for an indefinite period if Rodemeyers decided to make no more premium payments. Premium payments are approximately $1,200 annually and Rodemeyer will continue to be billed for the premium payments; if they are not paid, they will be deducted from the cash value. There was no discussion between Rodemeyer and Koenen about potential bankruptcy.

29. On January 15, 1988, Rodemeyers filed their Chapter 7 case petition. Rodemeyer, in the response to question 20(b) disclosed the transfer of funds to Hobson, Cady & Drew and the subsequent deposit in the life insurance policy. Rodemeyer also listed on his schedule of personal property the AAL policy having an estimated cash value of $34,000.00. Rodemeyer claimed the policy as exempt on schedule B–4 to its full value.

30. Koenen testified that the cash value would be expected to earn interest at the rate of 9.6% per annum.

31. FmHA never made inquiry to Rodemeyer as to the balance of or location of the savings account where the money being set aside for FLB was located. FmHA did not ask for account statements.

32. On FmHA form no. 1962–1, there were recorded farm product sales, portions of which were dedicated for potential use for the FLB payment. These were as follows:

| | |
|---|---|
| October 7, 1987: | $ 3,004.54 |
| October 9, 1987: | 10,731.06 |
| July 22, 1987: | 1,766.25 |
| 9–3–87—9–4–87: | 3,997.37 |
| 10–6–87: | 431.28 |
| October 5, 1987: | 595.30 |
| TOTAL: | $20,525.80 |

33. In 1987, Rodemeyer deposited in the savings account funds from government programs in the amounts of $2,487.00 and $4,506.00.

34. Rodemeyer testified that he believed that if there were no deal worked out with FLB, then a payment to FLB from the fund was not necessary and the money was his to do with as he pleased.

## DISCUSSION

Creditors, Hampton State Bank, Farmers Home Administration, and the trustee have objected to Rodemeyer's claim of exemption in the life insurance policy, to the

extent of the additional money paid in January of 1988—$25,820.90.

The trustee and FmHA argue that the claim of exemption, to that extent, should be disallowed because money was transferred into the policy with intent to hinder, delay or defraud creditors. Specifically, FmHA argues that its collateral was converted to create the exempt property and therefore the exemption should be denied. Additionally, FmHA also argues that the May, 1988 amendments to Iowa Code § 627.6 are applicable and that debtors may only claim, if otherwise exempt, the sum of $10,000.00 from the recent addition to the cash value of the policy.

It is also the trustee's argument that the addition to the policy is not in the nature of life insurance but rather is a cash deposit to a savings account.

Trustee has also filed this adversary proceeding naming the Rodemeyers and Aid Association for Lutherans as defendants seeking to avoid the transfer of additional money into the policy as fraudulent under state law as incorporated by 11 U.S.C. § 544(b) and as a transfer to hinder, delay or defraud creditors under 11 U.S.C. § 548(a)(2).

It was announced by the attorney for the trustee at the outset of trial that it was his agreement with AAL, the named defendant which did not appear nor file answer, that AAL would abide by any order of the court as to the disposition of the transferred funds.

## I.

■ Is the $25,820.90 addition to the policy in January of 1988 a purchase of life insurance within the meaning of Iowa Code § 627.6(6)? Trustee argues that the purchase was merely a deposit in a cash account similar to the cash deposit account purchased in *In re Gerald G. Buffinton*, 100 B.R. 448 (Bankr.N.D.Iowa, 1987). In that case, the court disallowed a claim of exemption as to a "Deposit Account" established with an insurance company for the future payment of premiums.

The policy discussed in *Buffinton, Id.* is different in two respects from the policy presently before the court. In *Buffinton*, there was a separate rider to the policy which established the deposit account. The court held that this was a separate contract and not one of insurance. In the case before the court, there is but one contract of insurance which gives the debtor the right to pay premiums in advance which increase the cash value of the policy. Monthly insurance costs are charged against the cash value.

Second, the deposits to the policy account in *Buffinton* appeared to have had no effect upon the death benefit. That is not true with the Rodemeyer policy. Rodemeyer, like Buffinton, clearly has the ability to withdraw the cash value of the policy. Further, Rodemeyer's payment to AAL in January of 1988 purchased no additional death benefit. It appears from the policy that pre-payment of premiums would only increase the death benefit at the point that the cash value of the policy exceeded the paid-up cash value. Policy, section 2.1.

Any partial withdrawal by Rodemeyer of cash value of the policy, apparently regardless of how much, would decrease the death benefit by the amount of the partial withdrawal. Policy, section 5.2. Therefore, while any payment to AAL by Rodemeyer in January did not purchase additional insurance, any ruling that the cash value is not part of the insurance policy would reduce the death benefit to Rodemeyer's beneficiaries.

With these differences in mind, the court finds and concludes that Rodemeyer's policy with AAL, including the advance payment of premiums in January, 1988, is insurance within the meaning of Iowa Code § 627.6(6).

## II.

■ Farmers Home Administration raises the question of whether, if exempt, debtor's claim to the increased cash value may exceed $10,000.00. FmHA argues that by virtue of Iowa Code § 627.6(6) (1988), the purchase of life insurance within two years of filing of bankruptcy is limited to $10,-

000.00. This, FmHA argues, is because § 9(2) of House File 649, amending the exempt status for life insurance, provides that the provisions of the Act relating to the exemption for life insurance apply to interests acquired on or after January 1, 1988. FmHA contends that the amended statute applies to this case.

The court disagrees. To the extent the addition to the policy is exempt, it is governed by the exemption statute in effect on the day the debtor filed his Chapter 7 case on January 15, 1988. *In re Hahn,* 5 B.R. 242, 245 (Bkrtcy.S.D.Iowa 1980).

The amended version of Iowa Code § 627.6(6) applies to bankruptcy cases filed on or after the date of its enactment, not to cases filed prior to that date.

The court, therefore, concludes that to the extent that Rodemeyer's life insurance acquisition in January, 1988 is otherwise exempt, it is not limited by the $10,000.00 limitation of Iowa Code § 627.6(6) (1988).

### III.

■ Also before the court is whether the debtor's conduct in obtaining the exempt property should require denial of the claim of exemption. Trustee and FmHA argue that it should.

Under Iowa law, a claim of exemption is to be liberally construed in favor of the debtor, and exceptions are to be narrowly construed. *Johanson v. Rowland,* 196 Iowa 724, 195 N.W. 358 (1923). The conduct of the person claiming the exemption in a bankruptcy case may be examined by the court to determine whether the exemption will be allowed. *Hanson v. First National Bank in Brookings (In re Hanson),* 848 F.2d 866, 868 (8th Cir.1988); *In re Hanson,* 41 B.R. 775, 778 (Bankr.D.N.D. 1984).

It was the debtor's conduct in acquiring the insurance interest that convinces the court that the claim of exemption should not be allowed.

The evidence showed that personal property secured to Farmers Home Administration was sold and, with permission of Farmers Home Administration, was set aside for the purpose of paying a portion of a debt to Federal Land Bank of Omaha as part of a tentative or hoped-for write-down agreement. There is no evidence before the court that Farmers Home Administration ever agreed to the use of the money for any other purpose, or that it agreed to the debtor's unrestricted use of the funds if no write-down agreement was reached.

The use of collateral proceeds in violation of that agreement to purchase life insurance was a conversion of Farmers Home Administration's interest in the collateral.

The evidence shows that the FmHA had a security interest in the cash proceeds of the sale of collateral. Debtor used $20,525.80 from the sales of farm products as part of his disbursements through the trust account of his attorney. Additional monies were used from government program payments in the amount of $6,993.00.

Distributed through the trust account was $31,121.52. Debtor does not dispute that the $20,525.80 of farm products proceeds was distributed through the trust account.

"Conversion" is an act of wrongful dominion over property and derogation of another's rights. *Welke v. City of Davenport,* 309 N.W.2d 450 (Iowa 1981).

A lien interest in personal property and a sale of the property in disregard of that interest is a conversion of the property of the lienholder. *U.S. v. Squires,* 378 F.Supp. 798 (S.D.Iowa 1974).

Timothy Rodemeyer testified that the security interest had been released; that since no final agreement with FLB had been reached, he believed he was free to use the money. The court does not find his testimony credible.

To the extent of the proceeds of farm products, Rodemeyer willfully converted the FmHA's security interest. He purchased life insurance in derogation of FmHA's rights and in violation of the agreement between the parties. The court believes this conversion was malicious within the meaning of 11 U.S.C. § 523(a)(6). *Barclays American Business Credit, Inc.*

*v. Long (In re Long),* 774 F.2d 875, 881 (8th Cir.1985).

Equitably, he should not be able to set up a claim of exemption against the Farmers Home Administration and have his retention of the property be determined under the law of secured transactions.

The court concludes, therefore, that because Rodemeyer intentionally converted cash proceeds of collateral secured to the FmHA into life insurance in violation of their agreement, he is not entitled to claim the cash value attributable to these proceeds as exempt.

The evidence was insufficient that there was an existing agreement between the parties as to the government program payments or that these funds were collateral of FmHA. Therefore, the court does not view the use of these payments to purchase life insurance in the same light as the use of cash proceeds of the collateral specifically set aside for the Land Bank payments.

According to FmHA form No. 1962–1, the proceeds set aside for the FLB payment totalled $20,525.80. To that extent, the exemption should be denied.

Debtors might argue that other non-converted funds of theirs were used for the addition to the policy. This is essentially a "tracing" argument which, while not raised at trial or in the briefs, will now be briefly discussed.

The sum of $31,121.52 was spent by debtors; $25,820.90 was for life insurance. The disbursements included $20,525.80 in proceeds of FmHA collateral. True, there was a mingling of converted and non-converted funds in one account. There was no showing when the various distributions of the funds took place. All must have taken place in a relatively short period of time, with the fund being entirely exhausted by the bankruptcy filing.

Only one asset obtained by disbursements from the fund remained at the time of filing. This asset had a value of $25,-820.90 less 7½% or $23,884.33, a value therefore in excess of the converted fund of $20,525.80. The funds placed with Hobson, Cady & Drew were not exhausted by the debtors prior to the acquisition of the added value to the policy.

Upon the foregoing, objectors here made a prima facie case (as to the debtors) tracing FmHA's collateral to the additional insurance. This was not rebutted by debtors.

*Republic Supply Co. of California v. Richfield Oil Co.,* 79 F.2d 375, 378 (9th Cir.1935); see also *Knatchbull v. Hallet (In re Hallet's Estate),* 13 Ch. DN 696; RESTATEMENT (SECOND) OF TRUSTS § 202(1) (1959).

### IV.

■ Because the court believes the exemption may be denied to the extent of $20,525.80 on the basis of malicious conversion, it will not address the avoidance of the purchase of that amount of insurance under 11 U.S.C. § 544(b) or § 548. As to Rodemeyer's alleged use of collateral (farm program payments) to purchase insurance in excess of $20,525.80, the court believes the evidence was insufficient to require setting aside the conveyance under 11 U.S. C. § 548 or under state fraudulent conveyance law as incorporated by 11 U.S.C. § 544(b).

### V.

■ Since the cash value of $20,525.80 is not exempt, consideration should be given to what is the present value of that portion of the policy. That amount should be adjusted to add accrued interest at AAL's actual rate upon that amount but not to deduct the 7½% one-time premium charge. This amount should not bear premium payments. It is the debtor's exempt portion of the added insurance which should bear the entire premium charge which was deducted by AAL.

### CONCLUSION

Debtors' interest in his AAL life insurance policy is not exempt under Iowa Code § 627.6(6) to the extent of $20,525.80 plus accrued interest.

## ORDER

IT IS THEREFORE ORDERED that to the extent of $20,525.80, the objections to the claim of exemption in life insurance are sustained.

SO ORDERED.